UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WALTER BILLUPS,

        Plaintiff,

   v.

NANCY A. BERRYHILL,

        Defendant.

Case No.18-cv-03098-EDL

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION TO REMAND**

Re: Dkt. Nos. 18, 23

     Plaintiff Walter Billups, Jr., seeks judicial review under 42 U.S.C. § 405(g) of the Commissioner of Social Security's denial of his application for Supplemental Security Income ("SSI"). Plaintiff filed a motion for summary judgment and Defendant filed a motion for remand. Plaintiff asks the Court to grant summary judgment for Plaintiff, reverse the decision of the Commissioner, and remand with instructions to award benefits pursuant to sentence four of 42 U.S.C § 405(g). In the alternative, the Court should remand for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g). Defendant requests a remand for further proceedings related to the ALJ's weighing of the medical evidence. For the reasons discussed below, Plaintiff's motion is denied and Defendant's motion to remand is granted.

## I.    BACKGROUND

     Plaintiff was 39 years old when he filed his initial claim for disability, dated June 1, 2009. AR 78. He completed high school through the 11th grade. AR 42. At the time of his application for benefits, Plaintiff alleged that he suffered from a learning disability, back spasms, a gunshot wound in back, hearing voices, anxiety, depression, and asthma. AR 78. Plaintiff's most recent employment was in 2009 when he worked in a temporary position at the port, worked for a janitorial cleaning service, and was in shipping at a warehouse. AR 42. Before that time, Plaintiff

lived in Louisiana where he cared for his mother and was employed full-time as a manual laborer. AR 42-43.

### A.    Procedural History

On August 1, 2014, Plaintiff filed an application for SSI, alleging a disability onset date of June 1, 2009.  AR 204.  His application was initially denied on November 3, 2014, and upon reconsideration on March 3, 2015.  AR 109-114, 116-21.

Plaintiff requested a hearing on his application for disability insurance benefits, and administrative law judge Arthur Zeidman (the "ALJ") held a hearing on February 21, 2016.  AR 38-77.  The ALJ received testimony from Plaintiff and a vocational expert.  38-77.  The ALJ issued an unfavorable decision on his application on March 10, 2017.  AR 12-35.  Upon reconsideration, the Appeals Council denied Plaintiff's request for review of the ALJ's decision on March 29, 2018.  AR 1-6.  The ALJ's decision became final on that date.  Plaintiff filed this lawsuit on May 24, 2018.

### B.    Plaintiff's Medical History

#### i.    Santa Rita Jail Records

The administrative record contains medical records from Plaintiff's incarceration in the Santa Rita Jail in Alameda County in 2013.  In October 2013, Plaintiff tested positive for tuberculosis, but he was not exhibiting symptoms and treatment was not advised.  AR 333.  A medical information transfer form noted that Plaintiff was taking medication for hypertension, anxiety, and chronic back and knee pain.  AR 335.  During an intake screening, Plaintiff complained of neck and shoulder pain two times a week.  AR 336.

In a computer-generated intake screening report, the nurse performing the evaluation reported that Plaintiff was alert and oriented to person, place, and time and did not have any mobility restrictions.  AR 337.  The nurse noted that Plaintiff has had high blood pressure or hypertension for over five years and currently takes medication for the condition.  AR 339.  In this report, the nurse stated that Plaintiff complained of left shoulder pain of more than seven days duration.  AR 340.  Plaintiff reported having a history of mental health disorder but denied a history of suicidal thoughts or a learning disability.  AR 340.

ii.   **East Oakland Health Center (treating providers)**

In 2012 and 2013, Plaintiff received primary care from Ramiro Soler, M.D., of the East Oakland Health Center.  Dr. Soler's treatment notes are often difficult to read but indicate that Plaintiff was being treated for knee and back pain and hypertension.  AR 374, 376, 378, 384, 388, 392, 394, 396, 401-15.  On February 26, 2013, Plaintiff appears to have complained of right knee pain for the first time and reported at a follow-up appointment on April 2, 2013 that the knee pain resolved.  AR 415, 418.  In Dr. Soler's notes from April 2, 2013, he noted that Plaintiff explained that his back pain makes it hard for him to stand or change positions in bed.  AR 418.  Dr. Soler often indicated that Plaintiff walked several times a week for exercise.  AR 374, 376, 380, 386, 388, 390, 394.

During a June 11, 2013 visit, Dr. Soler stated that Plaintiff had been "running daily for [sic] miles a day [and] has developed pain and swelling of knee L and R.  [N]o trauma."  AR 421.  Dr. Soler performed an examination of Plaintiff's knees and reported normal findings with no atrophy, aside from mild crepitation in the right knee.  AR 423.  At another appointment on July 16, 2013, Dr. Soler reviewed Plaintiff's X-ray results of his knees, which showed that bone alignment was within normal limits, although he has asymmetric posture and the left knee seems hyperextended.  AR 425.  Dr. Soler also noted that Plaintiff's examination was within normal limits.  AR 425.  He diagnosed knee tendinitis and recommended that Plaintiff ice his knees and complete muscle building exercises.  AR 425.  At another visit on August 20, 2013, Plaintiff complained of significant knee and leg pain and being unable to walk.  AR 429.  Dr. Soler reported that his examination of Plaintiff's left leg was within normal limits.  AR 429.

On October 23, 2013, Plaintiff sought evaluation from Dr. Soler for neck pain and shoulder swelling.  AR 398.  Plaintiff denied trauma or strenuous activity that might explain the shoulder discomfort.  AR 435.  Dr. Soler performed an examination of his shoulders and found generally normal results.  AR 438.  He commented that Plaintiff was likely resolving a muscle strain and had shoulder tendinitis.  AR 437-38.

On January 23, 2014, Plaintiff had an appointment with Merritt Smith, M.D.  Plaintiff's physical examination was generally normal, with the exception of tenderness of his lumbar spine

on inspection/palpation. AR 444-45. Dr. Smith reported that Plaintiff's gait was normal and he had the full range of motion of all joints. AR 445.

Dr. Smith ordered X-rays of Plaintiff's spine and shoulders, which were taken on April 29, 2014. AR 503-04. The X-rays showed mild to moderate disc space narrowing with endplate spurring in the mid and lower cervical levels of his spine and prominence of the uncovertebral joints which may cause foraminal stenosis. AR 503. The lower thoracic spine exhibited minimal levoscoliosis with mild disc space narrowing. AR 503. Plaintiff had mild levoscoliosis centered on L3 of his lumbar spine. AR 503. His lower lumbar spine had facet arthropathy and no significant disc space narrowing or compression fracture. AR 503. The radiologist's overall impression was that Plaintiff had degenerative changes throughout the course of the spine, most prominent are the lower cervical spine changes with possible foraminal stenosis. AR 503. The X-rays of Plaintiff's shoulders were unremarkable. AR 504.

In notes for an appointment on December 9, 2014, Dr. Smith stated that the physical examination was largely normal, aside from tenderness of the thoracic and lumbar spine. AR 486-87. He also conducted a mental status examination in which he reported that Plaintiff was not oriented to time, place, person, or situation. AR 487. Although Plaintiff exhibited normal judgment, Dr. Smith found that Plaintiff did not demonstrate appropriate mood or affect. AR 487. Approximately one month prior to this appointment, on October 28, 2014, Plaintiff's mental status examination was normal. AR 491.

On March 12, 2015, Dr. Smith referred Plaintiff to an ophthalmologist for a glaucoma consultation. AR 592. At this appointment, Plaintiff also complained of his chronic back pain and pain in his right hand. AR 592. Dr. Smith ordered X-rays of Plaintiff's hands and wrists. AR 601. The X-rays showed early osteoarthritis in the first carpometacarpal and first MTP joints. AR 601.

### iii.    Alameda County Medical Center (treating providers)

Alameda County Medical Center records indicate that Rick Ochoa P.A., also provided primary care to Plaintiff for a period of time in 2012 and 2013. The first records of Plaintiff's treatment by Mr. Ochoa are from August 8, 2012. AR 372. Plaintiff reported experiencing back

4

pain and that he was out of his medication.  AR 372.  Mr. Ochoa refilled his prescriptions for nifedipine, tramadolol, Vicodin, and trazodone.  AR 372.  On September 23, 2012, Plaintiff requested a refill of his Vicodin, which was denied with a note that he has repeatedly missed appointments and there was no record of "CURES/PAR."  AR 371.  Plaintiff missed his next appointment on October 12, 2012.  AR 370.  Plaintiff kept his October 31, 2012 visit, during which he reported constant back pain of 7-8 out of 10.  AR 368.  Mr. Ochoa noted that Plaintiff's condition was stable and he needed refills on his medications.  AR 368.

Plaintiff saw Mr. Ochoa again on April 10, 2013.  AR 367.  Plaintiff reported being out of his medications for two months.  AR 367.  Mr. Ochoa noted that Plaintiff was ambulatory and his insomnia had resolved.  AR 367.  On August 22, 2013, Plaintiff visited Ochoa with complaints of back and left knee pain.  AR 366.  Plaintiff rated the pain as 9-10 on a 10-point scale.  AR 366.  Ochoa reported that Plaintiff stated he had new pain in his right knee, as well as swelling and stiffness.  AR 366.  Ochoa recommended X-rays of Plaintiff's "weight bearing knees" and use of a cane.  AR 366.

On September 30, 2013, Plaintiff had images taken of his left knee due to his history of pain and swelling.  AR 359.  Eric Yasumoto, M.D., reviewed the scans, which indicated no fractures, dislocations, or effusions.  AR 359.  They showed, however, mild tricompartmental degenerative changes.  AR 359.

On October 3, 2013, Plaintiff saw Ochoa for a review of his X-ray results and to obtain medication refills.  AR 365.  Ochoa noted that he was ambulatory with the use of a cane.  AR 365.  Plaintiff rated his back and knee pain as a 7-8 on a 10-point scale.  AR 365.  For his knee pain, Ochoa recommended that Plaintiff begin leg lifts to increase his knee strength.  AR 365.

On February 27, 2014, Plaintiff visited S. Portnoy, P.A., for routine primary care.  AR 361.  He complained of chronic low back pain, which he has experienced for the last 10 years and was caused by a gunshot wound and a work-related injury.  AR 354.  Plaintiff also described a history of hypertension and osteoarthritis of the knees.  AR 354.  He complained at the visit of coughing and night sweats.  AR 354.  Plaintiff initially acknowledged that he is a smoker and has been for many years, but denied using alcohol or drugs, even though a urine screening was positive for

amphetamine and cocaine.  AR 355.  After receiving the urine screening results, Plaintiff admitted to using amphetamine and cocaine within a week of the tests.  AR 355.

### iv.    Sausal Creek Outpatient Stabilization Clinic

The administrative record includes records relating to psychiatric assessments of Plaintiff that were performed at the Sausal Creek Outpatient Stabilization Clinic.  AR 457-71.

The first assessment took place on July 2014 after Plaintiff was referred by his doctor.  AR 463.  Plaintiff reported sometimes having thoughts of harming other people and attempting to hurt other people in the prior week.  AR 463.  He also stated that he had problem with sleep and his appetite, hears voices, and has a depressed mood.  AR 465.  He described his distress or anxiety as interfering with his daily activities a lot.  AR 467.

In assessment notes from July 14, 2016, it is noted that Plaintiff has been hearing voices since 2005 and has been depressed since 2003.  AR 457.  This decline in Plaintiff's mental health is reportedly connected to the death of his father and grandmother.  AR 457.  Plaintiff stated that his appetite has decreased, he suffers from insomnia, and he has passive suicidal ideation with no intent.  AR 457.  In a mental status examination, Plaintiff was alert and oriented to person, place, and time.  AR 459.  He was engaged, his speech was normal, his grooming was poor, and his mood was depressed.  AR 459.  His affect was appropriate, and his thought process was logical, but his insight and judgment were marginal.  AR 459.  His thought content exhibited hallucinations.  AR 459.  He was diagnosed with psychosis NOS, depression NOS, and cannabis abuse.  AR 459.

### v.    Laura J. Catlin, Psy.D. (examining psychologist)

In a report dated September 11, 2014, Laura J. Catlin, Psy.D. provided the results of her psychological disability evaluation of Plaintiff.  AR 472-82.  The report's findings were based an examination of Plaintiff by Dr. Catlin, as well as various tests.  AR 472.  Based on the intelligence tests, Dr. Catlin concluded that Plaintiff has an IQ score of 65, which places him in the borderline to extremely low range of intellectual functioning.  AR 477.  In her mental status examination of Plaintiff, Dr. Catlin found that he was alert but somewhat disoriented, was marginally groomed but inappropriately dressed for the weather, his demeanor was anxious and fearful, his mood was

6

depressed and anxious, his affect was inappropriate and labile, he reported some suicidal thoughts without plan or intent, he reported hearing voices for many years, his thought process was tangential, his thought content evidenced some perversion on negative thinking and paranoia, and his insight and judgment were impaired.  AR 475-76.

Dr. Catlin, Psy.D. diagnosed Plaintiff with schizoaffective disorder – severely depressed with paranoia.  AR 479.  She opined that in addition to his severe paranoia, depression, and auditory hallucinations, Plaintiff has great difficulty relating to people and is distrustful and paranoid of people in general.  AR 479.  She noted that he hears voices and is fearful for his safety.  AR 479.  As a result, she opined that he is often preoccupied by his internal stimuli even when trying to concentrate on other tasks.  AR 480.  Dr. Catlin further opined that Plaintiff has serious cognitive impairments with severe memory deficiencies and very low intelligence.  AR 480.  She concluded that he is most vulnerable when he is under an even minimal increase in mental demands.  AR 480.

As a result of this assessment, Dr. Catlin opined that Plaintiff's ability to work is severely impaired in his ability to: understand and remember short and simple work-like procedures; carry out short and simple instructions; understand and remember detailed instruction; carry out detailed instructions; maintain adequate pace and persistence to perform simple tasks; maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; make simply work-related decisions; complete a normal workday and workweek without interruptions from psychologically-based symptoms; maintain adequate pace and persistence to perform complex/detailed tasks; perform at a consistent pace without an unreasonable number and length of rest periods; ask simply questions or request assistance; adapt to changes in job routine; withstand the stress of a routine workday; accept instruction and respond appropriately to criticism from supervisors; get along with co-workers and peers without unduly distracting them or exhibiting behavioral extremes; interact appropriate with co-workers, supervisors, and the public on a regular basis; be aware of normal hazards and take appropriate precautions; adhere to basic standards of neatness and cleanliness; travel to unfamiliar places; and use public transportation.

AR 480-81.

Dr. Catlin further opined that Plaintiff's impairments will cause him to be absent from work more than four days a month and that he is unable to engage in any meaningful employment or obtain or retain a job. AR 481. She specifically stated that it is her opinion that Plaintiff is not malingering. AR 481.

### vi.    Schuman-Liles Clinic (treating physicians)

#### a.    Christopher Stauffer, M.D.

On September 5, 2014, Plaintiff began seeing Christopher Stauffer, M.D., at the Schuman-Liles Clinic for psychiatric care. AR 546. At that time, Plaintiff's primary complaint was that he was hearing voices. AR 546. Plaintiff reported depression and anxiety for the preceding 4-5 years, as well as pain issues from being shot in the back. AR 547. He also described panic-like symptoms such as feeling like he's choking, as well as having trouble sleeping and thinking about hurting himself and others. AR 547. Dr. Stauffer diagnosed Plaintiff with chronic schizoaffective disorder and he prescribed clonazepam and olanzapine. AR 548. Dr. Stauffer continued to see Plaintiff for follow-up visits on an approximately monthly basis and switched Plaintiff's medication over time based on how he was responding. AR 522-45, 667-78, 687-98. Plaintiff also received treatment from James Liles, M.D, and Michael Hipolito, M.D.. AR 662-66, 679-86.

Dr. Stauffer completed a mental impairment questionnaire for Plaintiff on December 17, 2016. AR 714-19. In the form, Dr. Stauffer reported that Plaintiff has a diagnosis of schizoaffective disorder with an approximate onset date of 1996. AR 714. He opined that Plaintiff's prognosis was poor and chronic. AR 714. Dr. Stauffer stated that the severity of Plaintiff's mental impairment is demonstrated by the following clinical findings: severe symptoms since 1996, monotone, disheveled, malodorous, wearing bike helmet (to "keep him safe from attackers"), sunglasses throughout sessions, slowed movements, dysthymic, blunted, agitated at times, "AH," and history of suicidal ideation. AR 714. He stated that Plaintiff had anxiety signs and symptoms including autonomic hyperactivity, vigilance and scanning, apprehensive expectation, recurrent severe manic attacks, recurrent intrusive recollections of traumatic experience, and the complete inability to function independently outside his home. AR 715. With

respect to signs and symptoms of schizophrenia, Dr. Stauffer noted delusions or hallucinations, emotional withdrawal and/or isolation, and blunt affect.  AR 715.

Dr. Stauffer also opined about Plaintiff's limitations in various areas of functioning.  For understanding and memory, he opined that Plaintiff is moderately limited in his ability to remember locations and work-like procedures and understand and remember very short and simple instructions.  AR 716.  He opined that plaintiff is extremely limited in his ability to understand and remember detailed instructions.  AR 716.

For sustained concentration and persistence, Dr. Stauffer opined that Plaintiff is moderately limited in his ability to carry out very short and simple instructions.  AR 716.  He also opined that Plaintiff is markedly limited in his ability to make simple work-related decisions.  AR 717.  Finally, he opined that Plaintiff is extremely limited in his ability to carry out detailed instructions; maintain attention and concentration for a two-hour segment; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work with or near others without being distracted by them; and the ability to complete a normal workday and workweek uninterrupted by psychologically based symptoms; and the ability to perform at a consistent pace without an unreasonable number/length of rest periods.  AR 716-17.

For social interaction, Dr. Stauffer opined that Plaintiff is markedly limited in his ability to ask simple questions or request assistance.  He also opined that Plaintiff is extremely limited in his ability to interact appropriate with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without exhibiting behavioral extremes, and lastly, the ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  AR 717.

Regarding Plaintiff's ability to adapt, Dr. Stauffer opined that Plaintiff is moderately limited in his ability to be aware of normal hazards and take appropriate precautions in response to those hazards as well as moderately limited in the ability to travel in unfamiliar places or use public transportation.  AR 717.  He opined that Plaintiff is markedly limited in his ability to respond appropriately to changes in the work setting.  AR 717.  Finally, he opined that Plaintiff is

9

extremely limited in his ability to set realistic goals or make plans independently of others.  AR 717.

For activities of daily living, Dr. Stauffer opined that Plaintiff is markedly limited in his ability to perform home safety and maintenance tasks and consistently self-administer medications.  AR 717.  He further opined that Plaintiff is extremely limited in his ability to attend to personal grooming and hygiene, pay bills and attend to personal finances, and do shopping and cook food.  AT 717-18.

Finally, Dr. Stauffer opined that Plaintiff has moderate restrictions on his activities of daily living and extreme difficulties in maintain social functioning and maintaining concentration, persistence, or pace.  AR 718.  He opined that Plaintiff has had four or more episodes of decompensation within a 12-month period, each lasting at least 2 weeks duration.  AR 718.  Dr. Stauffer further opined that Plaintiff has a current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.  AR 718.  He also noted that Plaintiff has an anxiety-related disorder and complete inability to function independently outside the area of his home.  AR 718.  He estimated that Plaintiff would be absent from work as a result of his impairments for 5 or more days per month.  AR 719.  Dr. Stauffer also estimated that Plaintiff would be expected to be "off task" on the job more than 30% of the time and that the intensity, persistence, and limiting effects of his conditions and symptoms are expected to fluctuate over time.  AR 719.

### b.      Norman Cheung, M.D. (treating physician)

The administrative record contains records from Norman Cheung, M.D.'s treatment of Plaintiff in 2016.  AR 604-20.  Plaintiff's initial appointment with Dr. Cheung concerned his right ankle, which he twisted playing basketball on December 29, 2015.  AR 616.  Plaintiff visited the emergency room and was given a posterior splint for the ankle, but he was still experiencing pain at the time of his January 13, 2016 visit with Dr. Cheung.  AR 616.  Dr. Cheung's examination indicated gross swelling of the right ankle and pain on palpitation, although there was comfortable motion, less no gross instability, and neurovascularly intact.  AR 616.  An X-ray showed a minimally displaced oblique fracture of the lateral malleolus.  AR 616.  Dr. Cheung ordered a cast

boot for protection, rehabilitation exercises, and a follow-up appointment. AR 616. At his next appointment on January 28, 2016, Plaintiff reported feeling fine with no pain. AR 614. An X-ray showed a stable fracture and Dr. Cheung ordered Plaintiff to continue wearing the cast boot. AR 614.

At a further follow-up appointment on February 11, 2016, Plaintiff again reported feeling no pain in his right ankle but raised new complaints about bilateral knee pain and swelling, with the left worse than the right. AR 612. On examination of the knee, Dr. Cheung noted mild effusion, pain on palpation over the medial joint line, positive McMurray's test on the left knee, stable to stress, and neurovascularly intact. AR 612. Dr. Cheung ordered an MRI of Plaintiff's left knee. AR 613. Plaintiff's condition remained unchanged at his next appointments on February 25, 2016 and March 9, 2016, except that Plaintiff was allowed to bear weight on his right ankle and to stop physical therapy. AR 608, 610.

According to Dr. Cheung's notes from March 30, 2016, the MRI of Plaintiff's left knee showed chondromalacia of the medial and anterior compartment, possible small tear of the medial meniscus at the posterior horn, and fat pad irritation. AR 606. Dr. Cheung encouraged Plaintiff to try physical therapy and consider a cortisone injection for the knee. AR 606. At the next and final appointment with Dr. Cheung on July 25, 2016, he noted that he discussed treatment options with Plaintiff again and, once more, Plaintiff declined a cortisone injection but agreed to try Voltaren and Ultram and to go to physical therapy. AR 604.

### vii.    East Bay Pain Clinic

#### a.    Anthony Riley, M.D. (treating physician)

In July 2014, Plaintiff was referred to the East Bay Pain Clinic by Dr. Nirmala Kannan for chronic low back pain management to see Anthony Riley, M.D. AR 622. At his first visit, Plaintiff described his back pain as 10/10 when he was unmedicated, which interfered with his sleep and daily activities. AR 622. Plaintiff described the pain as being mostly limited to his back with spasms, with occasional sciatica to his thighs and, on rare occasions, buckling of his legs. AR 622. Plaintiff also complained of knee pain and occasional swelling from an old baseball injury. AR 622. At the time, Plaintiff walked with a cane. AR 622. Dr. Riley noted that Plaintiff

1   was alert and oriented with a good, believable attitude.  AR 623.  Dr. Riley prescribed pain Norco

2   and tramadol, with NSAID and Soma, and ordered several imaging tests to review the condition of

3   his spine, knees, and heart.  AR 623.

4        At his next appointment on August 3, 2015, Plaintiff reported that the Norco was not

5   helping, so Dr. Riley decided to advance him to oxycodone.  AR 625.  Dr. Riley noted that

6   Plaintiff had not yet been cooperative in having the prescribed imaging done of his spine, knees,

7   and heart as they discussed at his first appointment.  AR 625.

8        By Plaintiff's next appointment with Dr. Riley on August 17, 2015, Plaintiff had obtained

9   knee X-rays.  AR 628.  Dr. Riley opined that the images looked normal to the eye, but that they

10  needed a radiologist to read the X-rays.  AR 628.  Plaintiff did not have the chest X-ray or the

11  MRI completed as ordered.  AR 628.  Dr. Riley noted that Plaintiff was doing well on the current

12  oxycodone dosage as it was keeping Plaintiff functional and he was not having side effects.  AR

13  628.  Dr. Riley and Plaintiff agreed to discontinue the tramadol prescription.

14       On November 10, 2015, Dr. Riley received readings of Plaintiff's August 2015 knee X-

15  rays.  AR 634.  The images showed moderate bilateral arthrosis and sent him to orthopedist for a

16  surgery evaluation.  AR 634.  On December 7, 2015, Dr. Riley received Plaintiff's MRI and noted

17  that it evidenced significant right L4-5 forminal stenosis that correlated with Plaintiff's right leg

18  sciatica.  AR 637.

19       On January 4, 2016, Dr. Riley's notes reflect Plaintiff's recent right foot and ankle fracture,

20  for which he was treated in the emergency room and referred to an orthopedic doctor.  AR 640.

21  On April 19, 2016, Plaintiff's urine screening came back positive for cocaine and EtOH (ethyl

22  alcohol).  AR 652.  Dr. Riley explained that he cannot give a prescription for Oxycodone if

23  Plaintiff uses cocaine, which he described as an occasional "party" use, and Plaintiff assured Dr.

24  Riley that he will not test positive for cocaine in the future.  AR 652.  Dr. Riley refilled the

25  Oxycodone prescription.  AR 653.  On May 24, 2016, Dr. Riley noted that Plaintiff's urine screen

26  was again positive for cocaine, which was expected, but that today's test should be clear.  AR 655.

27       Plaintiff saw Dr. Riley again on July 26, 2016 and August 10, 2016.  AR 657-61.  Plaintiff

28  continued to test positive for cocaine, so Dr. Riley informed Plaintiff that he could no longer

1    prescribe opioids to him and would begin a tapering prescription. AR 658. Dr. Riley's notes state

2    that Plaintiff's orthopedist Dr. Cheung was offering conservative treatment for his knee and ankle

3    and that Plaintiff would return in two weeks for a knee steroid injection. AR 658. He also noted

4    that Plaintiff was being seen at the Fremont Spine and Pain Center and was told that surgery

5    would be put off for now and that he should re-try physical therapy first. AR 658.

6                        **viii.    Lesleigh Franklin, Ph.D. (examining psychologist)**

7           On October 26, 2016, Plaintiff was evaluated by Dionne Childs, M.S., and her supervisor,

8    Lesleigh Franklin, Ph.D., wrote a psychological evaluation dated November 25, 2016. AR 699-

9    706. The evaluation was based on a clinical interview, intelligence tests, and neuropsychological

10   status tests. AR 699. In the occupational history section of the report, Dr. Franklin stated that

11   Plaintiff described not being able to stand for long periods of time because of pain and that he has

12   a history of performing manual labor. AR 700. Plaintiff reflected on his workplace injury at the

13   Oakland docks and that the injury has affected his physical functioning. AR 700. He reported a

14   "low motivation for work and . . . persistent concerns about aggravating his injuries while at

15   work." AR 700.

16          Using the Wechsler Abbreviated Scale of Intelligence ("WASI"), Dr. Franklin opined that

17   Plaintiff has a full-scale IQ score of 55, which places him in the 0.1 percentile as compared with

18   adults in his age group and gives him an intellectual functioning that falls within the extremely

19   low range. AR 702. On the neuropsychological functioning test called the Repeatable Battery for

20   the Assessment of Neuropsychological status ("RBANS"), Plaintiff showed extremely low

21   functioning in the language category, poor execution and visual perception, extremely low

22   immediate and delayed memory, slow processing and extremely low attention and concentration,

23   and impaired executive functioning. AR 702-03. Dr. Franklin concluded that Plaintiff put

24   forward adequate effort on the RBANS examinations. AR 702. Dr. Franklin also opined that

25   based on the interview, review of records, and cognitive testing, Plaintiff displays

26   "impaired general metal abilities that impact adaptive functioning across multiple settings with an

27   onset during the developmental period." AR 703.

28          Dr. Franklin opined that Plaintiff has an intellectual disability, schizoaffective disorder—

                                                    13

depressive type, posttraumatic stress disorder, relational problems, occupational problems, and low income. AR 704. Dr. Franklin recommended that Plaintiff regularly attend psychotherapy sessions, maintain psychiatric mediation compliance, and receive an updated psychiatric medication evaluation. AR 705. She concluded that based on the severity of his symptoms, history of judgment, and self-reported concerns he would have difficulty managing finances in a responsible way on his own. AR 705.

### ix. Theresa Phillips, Psy.D. (examining psychologist)

On January 31, 2017, Theresa Phillips, Psy.D., performed a psychological evaluation of Plaintiff at the request of the California Department of Social Services. AR 722-30. Dr. Phillips provided a general overview of Plaintiff's complaints and past psychiatric history and current medications. AR 722-23. She explained that Plaintiff reported having physical limitations due to medical problems, although she stated that Plaintiff is independent for basic activities of daily living. AR 723. Dr. Phillips noted that Plaintiff can prepare meals, drive, take public transportation without supervision, make change and shop at the store, shower and dress himself. AR 723. She further stated that Plaintiff typically spends the day doing light household chores, visits with family and friends, and watches television. AR 723.

On a mental status examination, Dr. Phillips found that Plaintiff was well groomed, had a positive attitude, intact motor activity, good eye contact, and coherent speech, although he was slow to respond, soft spoken, and nodded off at times during the interview and assessments. AR 724. She noted that he was alert and oriented four ways, had moderately impaired intelligence and impaired attention, concentration, memory, and calculation. AR 724. He had poor judgment and fair insight, depressed mood, and full range of affect. AR 724. She noted that suicidal ideation was absent, his thought process was logical and linear, his though content was concrete, although it was remarkable because he stated that he hears "sounds like a radio and static in my head, not saying anything." AR 724.

Dr. Phillips performed a mini-mental state examination ("MMSE") test on Plaintiff. AR 724-25. Plaintiff received a score of 17 out of 30, which indicates a moderately impaired range of cognitive functioning. AR 725. Dr. Phillips opined that Plaintiff had no difficulty following

14

simple directions and difficulty in understanding and completing moderately complex directions. AR 725. He noted that his history and clinical presentation are indicative of a neurocognitive disorder. AR 725. Dr. Phillips also assessed a full-scale IQ score of 73 based on the WAIS, which is a borderline score.

Dr. Phillips assessed diagnoses of unspecified intellectual disability, schizoaffective disorder—depressed type, substantive abuse—per history, and disruptive, impulsive control, and conduct disorder—per history. AR 726. Dr. Phillips opined that Plaintiff is moderately impaired in his ability to follow complex/detailed instructions, maintain adequate attention and concentration, and maintain adequate pace or persistence to perform complex tasks. AR 727. Dr. Phillips also opined that Plaintiff is severely impaired in his ability to interact appropriately with co-workers, supervisors, and the public on a regular basis and to adapt to changes, hazards, or stressors in the workplace setting. AR 727. She opined that he is unable to manage his own funds. AR 727. Otherwise, Dr. Phillips opined that Plaintiff is unimpaired in his ability to follow simple instructions, to maintain adequate pace or persistence to perform one or two step simple repetitive tasks, to adapt to changes in job routine, and to withstand the stress of a routine workday. AR 727.

A handwritten medical source statement that was signed by Dr. Phillips and dated January 31, 2017, is also contained in the administrative record. In this handwritten version, Dr. Phillips' residual function capacity ("RFC") was the same as the other medical source statement, except that she assigned moderate – as opposed to severe – limitations on Plaintiff's ability to interact appropriate with supervisors, co-workers, and the public, as well as his ability to respond appropriate to usual work situations and to changes in a routine work setting. AR 728.

> **x.** **Non-examining Medical Assessments by Owen Daniels, M.D.; I. Newton, M.D.; Harvey Bilik, Psy.D.; and I. Ocrant, M.D. (state agency consultants)**

Owen Daniels, M.D., and I. Newton, M.D., provided medical assessments of Plaintiff's condition based on the medical record and other evidence supplied with Plaintiff's application. Dr. Daniels concluded that Plaintiff has two medically determinable severe impairments: (1)

osteoarthrosis and allied disorders, and (2) schizophrenia and other psychotic disorders. AR 84. He found that these severe impairments did not meet or equal a listing. AR 84.

Dr. Newton evaluated Plaintiff's RFC and assigned the following limitations: (1) occasionally lift and/or carry 50 pounds; (2) frequently lift and/or carry 25 pounds; (3) stand and/or walk 6 hours in an 8-hour workday; and (4) sit 6 hours in an 8-hour workday. AR 86-87. Dr. Newton did not assign any postural, manipulative, visual, communicative, or environmental limitations. AR 87.

Dr. Daniels assessed Plaintiff's mental RFC with moderate limitations on the ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or in proximity to others without being distracted by them; (7) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) interact appropriately with the general public; (9) accept instructions and respond appropriately to criticism from supervisors; (10) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (11) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (12) respond appropriately to changes in the work setting. AR 88-89. Based on these mental and physical limitations, Plaintiff was found to be capable of performing unskilled medium work. AR 90-91.

Harvey Bilik, Psy.D.. and I. Ocrant, M.D. assessed Plaintiff's alleged disabilities at the reconsideration level. Plaintiff claimed that his hand pain worsened and his mental health had deteriorated and the voices were telling him to kill himself. AR 282-83. Dr. Bilik concluded that Plaintiff has three severe impairments: (1) disorders of back—discogenic and degenerative; (2) carpal tunnel syndrome; and (3) schizophrenia and other psychotic disorders. AR 98. He further found that none of these impairments met or equaled a listing. AR 98-99.

Dr. Ocrant assessed the following physical limitations: (1) occasionally lift and/or carry 20

pounds; (2) frequently lift and/or carry 10 pounds; (3) stand and/or walk for 6 hours in an 8-hour workday; (4) sit for 6 hours in an 8-hour workday; (5) frequently climb and ramps or stairs; (6) occasionally climb ladders, ropes, or scaffolds; (7) occasionally stoop or crouch; (8) frequently kneel or crawl; (9) limited handling, fingering, or feeling; and (10) avoid concentrated exposure to extreme cold and hazards. AR 101-02. These physical limitations are more restrictive than the limitations Dr. Daniels assigned to Plaintiff at the initial consideration level.

Dr. Bilik assigned Plaintiff moderate mental limitations in the ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or in proximity to others without being distracted by them; (7) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) interact appropriate with the general public; (9) accept instructions and respond appropriately to criticism from supervisors; (10) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (11) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (12) respond appropriately to changes in the work setting; and (13) set realistic goals or make plans independently of others. AR 103-05.

On reconsideration, Plaintiff was again found not disabled, although he was found capable of performing only light unskilled work. AR 106.

## II. ALJ HEARING

### A. Plaintiff's Testimony

On February 21, 2017, the ALJ held a hearing on Plaintiff's disability application. AR 38. Plaintiff appeared in person to testify. AR 38. Plaintiff testified that he attended high school through the 11th grade and did not receive any additional vocational training. AR 42. While in school, Plaintiff was in special education classes for a learning disability. AR 58. He is single and has received benefits in the form of general assistance and food stamps. AR 42. He does not have

a driver's license and depends on the help of a friend for transportation.  AR 42.

Plaintiff explained that his most recent work was in 2009 when he worked in a temporary position at the Port of Oakland, in a janitorial cleaning service, and in shipping at a warehouse. AR 43.  Prior to that, Plaintiff lived in Louisiana where he cared for his mother and worked full-time as a laborer working with heavy objects.  AR 43-44.  Plaintiff lived in Louisiana in 2002 and worked as a laborer for a year.  AR 43-44.  In 2003, Plaintiff moved back to California and worked in temporary positions.  AR 44.  For example, Plaintiff worked at the Port of Oakland through a temporary staffing agency and was responsible for unloading the trains and placing the shipped goods onto pallets to be transported to its ultimate destination.  AR 45-46.  He worked at the Port of Oakland for three months until he slipped and injured his back.  AR 46.  This injury further exacerbated a previous injury that he sustained from receiving a gunshot in the back.  AR 46.  Plaintiff testified that he has not been able to work since suffering the back injury at the Port of Oakland.  AR 46.

Plaintiff described a typical day in his life.  He testified that he lives with a friend in an apartment.  AR 56.  Plaintiff testified that he typically sleeps for approximately four hours a night. AR 59.  He described having trouble sleeping because it takes him a long time to get comfortable, he experiences tossing and turning, and he hears voices.  AR 59.  When he wakes up in the morning, he usually takes a shower and his friend will prepare breakfast.  AR 56.  After that, he stays in the house and does not do anything.  AR 56.  He testified that he watches television and will need to stand up and walk around at some point.  AR 56.  From time to time, he may have an appointment or run errands, like shopping for groceries or clothes, although he will try to avoid being outside of the house for long periods of time because he is paranoid about what might happen while he is gone.  AR 56-57.  His roommate takes care of setting out clothes for him to wear and cooking dinner.  AR 57.  Plaintiff stated that he tries to keep his area clean, although his roommate will often clean his area when she cleans the rest of the apartment.  AR 64.  He testified that he has trouble eating, either because he is in too much pain or the voices tell him to not eat. AR 60.  Plaintiff testified that he used to have two dogs, but the dogs ran away or were stolen.  AR 62-63.

United States District Court
Northern District of California

The ALJ followed-up on this testimony with specific questions about Plaintiff's back injuries. AR 46. Plaintiff testified that he was shot when he lived in Louisiana. AR 46. He was treated for the gunshot in Louisiana, although it continued to trouble him and he has been seeing a doctor and a psychologist for it since it was initially treated. AR 46. Since re-injuring his back while working at the Port of Oakland, his condition has worsened. AR 46. He is involved in pain management to alleviate his symptoms. AR 46. He testified that his doctor reviewed an MRI of his back and described seeing two holes on the right bottom side of his spine. AR 47. His doctor explained that the holes cause pain to radiate from his back to the heel of his foot. AR 47. Plaintiff described being unable to put pressure on the heel of his foot or sit or stand for long periods of time because of the sharp pain. AR 47. Plaintiff stated that he can only sit for 5-7 minutes before the pain in his back becomes too great and he needs to walk around. AR 61-62. He testified that when he walks around he can walk at most for 2 blocks. AR 62. Plaintiff testified that there is also a hole on the left side of his spine, but it is not as serious or painful as the holes on the right side. AR 47. Plaintiff further testified that his doctor has advised him that he will need surgery at some point if the physical therapy he receives does not work. AR 47. Plaintiff testified that when he feels this pain it is like he has "Charlie horses in [his] back" and his back is spasming. AR 54. When this happens, he takes medication to try to stop the pain or he tries to walk around. AR 54. He testified that sometimes the back pain is so severe that he is unable to eat or sleep and, as a result, has been losing weight. AR 54.

Plaintiff also receives treatment at the Schuman-Liles Clinic for his mental health issues. AR 48. Plaintiff testified that he receives "pain medicine" for the voices he hears and medication to help him sleep and eat, as well as talk therapy with his psychologist. AR 48, 55. Plaintiff testified that the voices talk to him frequently and encourage him to hurt himself and others. AR 55. Plaintiff also testified to being very emotional and crying frequently. AR 58. He described being disappointed in himself and not having any help. AR 58. He testified that he sometimes feels like hurting himself and that he has panic attacks. AR 60. Sometimes the panic attacks will make him jump out of his sleep and he will think he is about to have a heart attack and die. AR 61.

In addition, Plaintiff testified to receiving treatment from Dr. Chung for a broken ankle. AR 48. After breaking his ankle, Plaintiff wore a cast for three months. AR 48. At some point while receiving treatment for his ankle, Plaintiff also experienced pain in one of his knees that Dr. Chung diagnosed as being caused by fluid in the knee and which caused swelling and pain. AR 48. Dr. Chung recommended that Plaintiff receive a cortisone shot, but Plaintiff declined that treatment because he is afraid of needles. AR 49.

During the hearing, the ALJ also asked Plaintiff to testify about the periods in 2012 and 2013 during which he was in the Santa Rita Jail. AR 49. Plaintiff testified that he was first jailed on a robbery charge from a misunderstanding that stemmed from a small falling-out he had with a romantic partner. AR 49-50. The robbery charge was dropped soon after he turned himself in to the police. AR 50. The second time he was jailed arose from another disagreement with a friend, which Plaintiff attributed to the voices he hears. AR 50. Plaintiff testified that he was released from jail after approximately three days and the police dropped the charges. AR 50. He explained that he tries to stay inside his home most of the time because he is concerned that he will become agitated in response to the voices and lose his temper with another person. AR 50-51.

Plaintiff also testified to being incarcerated in the late 1990s for drug possession. AR 51-52. The ALJ asked Plaintiff to clarify his statements to medical providers that he has never used drugs in light of this history of drug possession. AR 52. Plaintiff responded that he "must have misunderstood what [he] was saying" in response to the medical providers' questions and that he never said he never used drugs. AR 53. Plaintiff testified that his legal trouble with drugs occurred in the 1990s only. Id.

### B. Vocational Expert's Testimony

Stephen Schmidt, a vocational expert, also testified at the hearing. As an initial matter, Mr. Schmidt testified that none of Plaintiff's work in the last 15 years qualifies as substantial gainful activity. AR 66.

The ALJ asked Mr. Schmidt to consider a hypothetical person of Plaintiff's age and educational background with the following limitations on medium work: (1) occasionally lift and/or carry 50 pounds; (2) frequently lift and/or carry 25 pounds; (3) sit, stand, or walk for 6

hours in an 8-hour workday; and (4) push and/or pull as much as he can carry and/or lift. AR 66.
Mr. Schmidt testified that this hypothetical person could engage in the following occupations: (1)
laborer—stores, DOL listing 922.687-058, medium, SVP 2, 597,000 jobs; (2) cleaner—hospital,
DOL listing 323.687-014, medium, SVP 2, 441,000 jobs; and (3) Cleaner II, DOL listing 919.687-
014, medium, SVP 1, 195,000 jobs. AR 67. Mr. Schmidt further testified based on his experience
placing and working with individuals in employment –and not on the DOT manual – that this
hypothetical person could perform these jobs even if the individual was absent from work one day
a month. AR 68, 70. However, the individual would be precluded from any work if he was absent
two days a month. AR 69.

The ALJ then asked Mr. Schmidt to consider another hypothetical person of Plaintiff's age
and educational background with a different set of limitations on medium work:
(1) occasionally lift and/or carry 50 pounds; (2) frequently lift and/or carry 25 pounds; (3) sit,
stand, or walk for 6 hours in an 8-hour workday; (4) push and/or pull as much as he can carry
and/or lift; (5) only communicate simple information; (6) only under, remember, and carry out
simple instructions; (7) only perform simple routine tasks; (8) use judgment that is limited to
simply work-related decisions; (9) frequently respond appropriately to supervisors; (10) interact
with coworkers and the public frequently; and (11) only deal with changes in the work setting that
are limited to simple work-related decisions. AR 67. Mr. Schmidt testified that this hypothetical
person would still be able to perform the three jobs he identified in response to the first
hypothetical. AR 68. If another limitation was added that the individual had moderate difficulty
in maintaining concentration, persistence, and pace, such that he would be 15% slower than the
average worker, Mr. Schmidt testified that the individual in hypothetical one or two would not be
able to perform any jobs. AR 69.

The ALJ posed a third hypothetical person that has the same limitations of the second
hypothetical person, except that the individual can never respond appropriately to supervisors,
coworkers, or the public. AR 68. Mr. Schmidt testified that there are no jobs in the economy that
this third hypothetical person could perform. AR 68.

### III.    ALJ DECISION

#### A.    Step One – Substantial Gainful Employment

At step one, the ALJ found that Plaintiff had not worked since his application date and so has not engaged in substantial gainful activity.  AR 17.

#### B.    Step Two – Severe Impairment(s)

The ALJ determined that Plaintiff has the following severe impairments: degenerative disc disease of the spine status post gunshot wound; bilateral degenerative joint disease of the knees; schizoaffective disorder; and intellectual disability.  AR 17.

The ALJ also found that that Plaintiff's impairments of hand pain, anxiety, and depression were non-severe impairments.  With respect to the hand pain impairment, the ALJ determined that imaging studies of Plaintiff's hands and wrists show only early stage osteoarthritis (alternatively diagnosed as bilateral carpal tunnel syndrome) and his treatment records do not reflect hand pain complaints that meet the durational requirements (i.e., at least 12 months since the application date).  AR 17.  In addition, the ALJ noted that this condition only minimally affects Plaintiff's ability to perform basic work activities, since he does not use a hand brace or receive physical therapy for his hands or wrists.  AR 17.  Regarding depression, the ALJ stated that there is no evidence in the record reflecting that Plaintiff has been diagnosed with depression or post-traumatic stress disorder for at least 12 continuous months and he does not attend therapy or counseling to address these issues.  AR 18.

Plaintiff alleged a host of additional impairments that the ALJ also found were not severe.  She rejected Plaintiff's hypertension as a severe impairment because although he has a long history of hypertension the record does not reflect complications arising from this condition.  AR 18.  The ALJ also concluded that Plaintiff's suspected chronic obstructive pulmonary disease is not a medically determinable impairment because he receives limited treatment for the disorder, has negative chest imaging studies, and normal respiratory findings.  AR 18.  As for Plaintiff's reported shoulder impairment, the ALJ determined it was not severe because Plaintiff only sporadically complains of shoulder pain and it is temporary in nature.  AR 18.  Moreover, the ALJ noted, upper extremity examinations of Plaintiff's shoulders show normal extremity strength, an

intact neurovascular system, and a full range of motion bilaterally and an April 29, 2014 imaging study of Plaintiff's shoulders was unremarkable. AR 18. With respect to Plaintiff's ankle fracture from playing basketball on or around December 29, 2015, the ALJ found that it was a non-severe impairment because Plaintiff only wore a cast for a few weeks and by July 25, 2016 he denied any further problems with his ankle. AR 18.

Finally, the ALJ noted medical record evidence of Plaintiff's diagnosis of cannabis abuse and occasional toxicology test results returning positive for amphetamine and cocaine. AR 18. While noting that Plaintiff's controlled medications have been discontinued because of his amphetamine and cocaine use and citing Plaintiff's own acknowledgment that he uses these substances occasionally and at parties, the ALJ concluded that his drug use is not a severe impairment or is immaterial to the case. AR 18-19. The ALJ cited Dr. Riley's February 3, 2016 report that Plaintiff's marijuana use was prescribed due to chronic pain, the overall medical report's indication that Plaintiff has suffered minimal complications as a result of his drug and alcohol use, and Plaintiff's representative's agreement with this interpretation of the evidence. AR 18-19.

### C.      Step Three – Listed Impairment(s)

At the third step of the sequential analysis, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meet or equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 19. Regarding Plaintiff's physical impairments, the ALJ concluded that there is no persuasive opinion or other evidence suggesting that his physical impairments, alone or in combination, meet or exceed a listing. AR 19. Plaintiff argued that his physical condition meets listings 1.02 (major dysfunction of a joint(s)) and 1.04 (disorders of the spine), but the ALJ found no evidence of severe upper extremity impairment, mild to unremarkable imaging studies, and normal range of motion findings on the upper extremities. AR 19. The ALJ noted that the record does not support the finding that Plaintiff's back impairment causes nerve root compression, spinal arachnoiditis, or pseudoclaudication. AR 19. Moreover, he acknowledged that Plaintiff alleges that he needs a cane to walk, but notes that medical records reflect that Plaintiff has a normal gait. AR 19. Finally, the ALJ considered

whether Plaintiff met listing 3.03 (asthma) because of Plaintiff's complaint of asthma, but determined that the record does not contain any pulmonary function studies or at least three hospitalizations arising from Plaintiff's asthma.

The ALJ also concluded that the severity of Plaintiff's mental impairments also do not meet or equal listings 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (depressive, bipolar and related disorders), 12.05 (intellectual disorder), or 12.06 (anxiety and obsessive-compulsive disorders). AR 19. In reaching this conclusion, the ALJ considered the "paragraph B" and the "paragraph C" criteria. AR 19-20. The paragraph B criteria provide that the mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace; or adapting or managing themselves. AR 19. The ALJ determined that Plaintiff has moderate limitations in all of these areas. AR 19-20.

Under paragraph C, the mental disorder must be "serious and persistent," meaning that there must be a medically documented history of the existence of the disorder over a period of at least 2 years. The mental disorder must also require ongoing medical treatment, mental health therapy, psychosocial support, or a highly structured setting to diminish the symptoms and signs and, despite diminished symptoms, Plaintiff has only achieved marginal adjustment. The ALJ found that the record fails to establish the presence of all of these criteria, noting that Plaintiff spends most of the day by himself watching television and so does not require a highly structured setting or supervision to care for his personal needs and attend his appointments. AR 20. The ALJ also noted that Plaintiff only receives psychotropic symptom management for his mental impairments without any regularly ongoing counseling or therapy. AR 20.

The ALJ also specifically evaluated Plaintiff's satisfaction of listing 12.05 for intellectual disorders. AR 21-22. He found that Plaintiff did not meet the conditions of listing 12.05 because he is able to perform his own personal care needs, spends most of his day inside his house watching television, and there is no evidence of an intellectual disorder prior to age 22 in the record. AR 21. The ALJ clarified that although Plaintiff claims he participated in special education as a child, his high school records do not reflect any special education classes and

instead show that he was enrolled in algebra, geography, and science and his only noted problem was non-attendance. AR 22. The ALJ also noted that Plaintiff has inconsistently claimed a learning disability. AR 22. Finally, the ALJ only accepted the IQ score administered by Dr. Phillips (73) and rejected the IQ score obtained by Dr. Franklin (55) because Dr. Franklin only used the Wechsler Abbreviated Scale of Intelligence rather than a standardized intelligence test. AR 22. Moreover, Dr. Phillips' IQ score of 73 was not accompanied by findings of marked or extreme limitations in any of the paragraph B findings, so that his intellectual disability, even if found to have been established prior to age 22, would not have been deemed to be a listing of severity. AR 22.

### D. Step Four – RFC and Past Relevant Work

The ALJ determined that Plaintiff has the RFC to perform medium work with the following limitations: lifting and carrying 50 pounds occasionally, lifting and carrying 25 pounds frequently, and ability to push and pull as much as Plaintiff can lift or carry. ALJ has determined that Plaintiff is limited to sitting, standing, or walking for 6 hours. As for limitations regarding the Plaintiff's ability to communicate, the ALJ determined that Plaintiff is limited to communicating simple information. As to the ability to understand, remember, and carry out instructions, the ALF determined that Plaintiff is limited to performing simple, routine tasks. Regarding Plaintiff's ability to use judgment, the ALJ determined that Plaintiff is limited to making simple work-related decisions. As to limitations regarding responding appropriately to supervisors, coworkers, and the public, the ALJ determined that Plaintiff has the capacity to frequently interact and respond with those individuals. Lastly, the ALJ determined that Plaintiff's capacity to deal with changes in the work setting is limited to simple work-related decisions. AR 22.

In preparing this RFC, the ALJ explained that the record supported some of Plaintiff's allegations about his functional abilities, particularly as to his back pain, knee pain, and mental impairments and symptoms. AR 23-24. However, he found that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of those symptoms are not entirely consistent with the record. AR 24.

The ALJ considered Plaintiff's activities of daily living and found that they are not as limited as one would expect given Plaintiff's complaints of disabling symptoms and limitations. AR 25. Plaintiff reported to the Social Security Administration in 2014 that he did not go outside and spent all day inside watching television, but the ALJ pointed out that his treatment notes reflect otherwise. AR 25. For instance, the notes show that Plaintiff played basketball in 2016 and also that he occasionally used cocaine to "party." AR 25. On January 31, 2017, Plaintiff reported that he could prepare meals, drive a car, and shop at the store. AR 25.

In addition, the ALJ noted that Plaintiff's course of treatment has been essentially routine and/or conservative in nature. AR 25. The ALJ remarked that the record reflects that Plaintiff's medications are successful in alleviating his pain. AR 25. For example, on September 14, 2015 and October 13, 2015, Plaintiff stated that he was doing well on oxycodone, that he had no side effects from his pain medications, and that his medications kept him functional while reducing his knee pain. AR 25. At the hearing Plaintiff stated that surgery and cortisone injections were recommended for his knee pain, but he declined. AR 25. Instead, Plaintiff chose to rely on pain medications and Voltaren gel for his knee pain. AR 25. Plaintiff was also advised to attend physical therapy for his knees and back, but he repeatedly missed his appointments and does not complete his home exercise programs. AR 25. The ALJ noted, however, that when Plaintiff does participate in his physical therapy sessions the record reflects that he feels better. AR 25. The ALJ also explained that Plaintiff's mental symptoms are sufficiently managed with psychotropic medications, he does not attend therapy or counseling sessions, and he has not had any psychiatric hospitalizations. AR 25. Finally, the ALJ noted that Plaintiff has experienced other non-medical problems such as news of his sister's failing health and the passing of his grandmother, which the ALJ believes that at least some of his difficulties may be situational, rather than medical in nature. AR 25.

The ALJ also assessed the various medical opinion evidence contained in the record. He assigned great weight to the October 21, 2014 physical assessment of state agency medical consultant, Dr. Newton. AR 25. Dr. Newton's opinion was assigned great weight because it was based on a thorough review of the medical record, program expertise, and is consistent with

26

1  Plaintiff's most recent admissions that he plays basketball, cleans his own living space, prepares

2  meals, shops in stores, can drive a car, and uses cocaine but only at parties.  AR 25-26.

3      The ALJ also assigned great weight to the mental assessments of state agency medical

4  consultants Dr. Daniels and Dr. Bilik.  AR 26.  Similar to the ALJ's assessment of Dr. Newton's

5  opinion, the ALJ found these mental assessments to be based on a thorough review of the record,

6  based on program expertise, and are consistent with Plaintiff's conservative mental health

7  treatment.  AR 26.  Still, the ALJ assigned slightly greater mental functioning limitations than

8  recommended by these opinions to account for some of Plaintiff's subjective complaints.  AR 26.

9      The ALJ gave significant weight to the opinion of psychological consulting examiner Dr.

10  Phillips, who gave moderate limitations to Plaintiff's mental functioning and moderate and severe

11  limitations to Plaintiff's ability to function in the workplace.  AR 26.  The ALJ assigned

12  significant weight to Dr. Phillips's moderate mental functioning limitations and moderate

13  "paragraph B" findings (i.e., mental functioning) because her findings were based on objective

14  medical findings and personal observations that were consistent with the evidence as a whole.  AR

15  26.

16      The ALJ gave reduced weight to the physical assessment of state agency medical

17  consultant, Dr. Ocrant, because it was overly reliant on Plaintiff's subjective complaints related to

18  his non-durational hand pain and inconsistent with Plaintiff's activities of daily living such as

19  playing basketball, preparing meals, and shopping, which the ALJ learned Plaintiff was able to do

20  at the hearing but Plaintiff had denied doing earlier.  AR 26.

21      The ALJ assigned little weight to Plaintiff's mental health assessments by Dr. Catlin, Dr.

22  Franklin, and Dr. Stauffer.  AR 27-28.  According to the ALJ, Dr. Catlin, who examined Plaintiff

23  at the request of his social worker to determine his eligibility for Social Security benefits, should

24  be accorded little weight because her opinion is based on a one-time evaluation and is inconsistent

25  with treatment notes about Plaintiff's memory.  AR 27.  In addition, the ALJ pointed out that Dr.

26  Catlin opined that Plaintiff decompensates easily, although the record reflects no evidence that

27  Plaintiff has been hospitalized because of his mental illness.  AR 27.  The ALJ placed little weight

28  on Dr. Franklin's opinions because she performed a one-time evaluation in the context of

1    Plaintiff's benefits application and not in the course of treatment and her findings were

2    inconsistent with Plaintiff's conservative treatment, noting that Plaintiff does not receive

3    counseling, nor has he been involuntarily hospitalized.  AR 27.

4         The ALJ explained that he gave little weight to Dr. Stauffer's check-box opinion form

5    primarily because it did not provide any detailed explanations for the assigned limitations.  AR 28.

6    The ALJ also found that it was improper for Dr. Stauffer to opine that Plaintiff's symptoms have

7    been present since 1996 even though Plaintiff did not begin treatment with him until 2014 and

8    treatment notes from 2013 state that Plaintiff denied any schizophrenia, depression, psychiatric

9    hospitalizations, hearing voices, or psychotherapy.  AR 28.  The ALJ also criticized Dr. Stauffer's

10   observation that Plaintiff never used drugs or alcohol because it is inconsistent with the medical

11   record, which demonstrates multiple positive toxicology reports and Plaintiff's own admissions

12   about drug and alcohol use.  AR 28.  The ALJ reflected that this inaccuracy calls into question

13   whether Dr. Stauffer has a full understanding of Plaintiff's mental health, or instead based his

14   opinion on a desire to help Plaintiff obtain supportive documentation for his benefits application.

15   AR 28.  Finally, the ALJ discounted Dr. Stauffer's opinions because he opined that Plaintiff had

16   extreme mental functioning limitations, while only providing treatment that consisted primarily of

17   psychotropic medicine without any referrals to counseling or individualized therapy.  AR 28.

18        In addition to these specific medical source opinions, the ALJ gave little weight to the

19   Global Assessment of Functioning ("GAF") scores of 40-55 that are found in the record.  AR 26.

20   These scores would indicate major to moderate difficulties in social, occupational, or school

21   functioning.  AR 26.  The ALJ explained that GAF scores, standing alone, are of little probative

22   value and they are not meant to reflect Plaintiff's longitudinal functioning.  AR 26-27.

23        Finally, the ALJ assigned only partial weight to the third-party statement of the Plaintiff's

24   friend.  While the friend's statement regarding Plaintiff's ability to take out the trash, walk to the

25   lake to feed the birds, and keep his area clean, are consistent with the medical record and

26   Plaintiff's conservative medical treatment (AR 26), the ALJ gave little weight, however, to the

27   friend's statement regarding Plaintiff's reported functional limitations, such as that Plaintiff can

28   only walk 2 blocks and uses a cane and walker to ambulate.  AR 26.  The ALJ found that these

limitations are overly restrictive compared to the evidence as a whole and the objective medical findings indicating that Plaintiff has a normal gait and walks without an assistive device.  AR 26.

The ALJ found that Plaintiff does not have any relevant work experience.  AR 28.

### E.    Step Five – Ability to Perform Work in the National Economy

Based on Plaintiff's age, education, work experience, and RFC, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. AR 29.  Relying on the vocational expert's testimony at the hearing, the ALJ found that Plaintiff could perform the job of (1) laborer—stores, DOL listing 922.687-058, medium, SVP 2, 597,000 jobs; (2) cleaner—hospital, DOL listing 323.687-014, medium, SVP 2, 441,000 jobs; and (3) Cleaner II, DOL listing 919.687-014, medium, SVP 1, 195,000 jobs.  AR 29.  Accordingly, the ALJ determined that Plaintiff has not been under a disability since his application was filed.  AR 29.

### IV.    LEGAL STANDARD

This Court has the authority to review the Commissioner's decision to deny benefits.  42 U.S.C. § 405(g); see Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  The Commissioner's findings may be set aside if they are based on legal error or are not supported by substantial evidence.  See Reddick, 157 F.3d at 720.  Substantial evidence is defined as relevant evidence that a reasonable person might accept as adequate in support of a conclusion; it is "more than a mere scintilla but less than a preponderance."  Id.; see also Richardson v. Perales, 402 U.S. 389, 401 (1971); Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir.1997).  Reasoning not relied upon by the ALJ cannot be applied to affirm the ALJ's decision.  See Cequerra v. Sec'y, 933 F.2d 735, 738 (9th Cir. 1991).

To determine whether the ALJ's decision is supported by substantial evidence, courts review the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's decision.  See Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If the evidence is susceptible to more than one rational interpretation, the Court must uphold the ALJ's conclusion.  Id. at 1030-40.  The trier of fact, not the reviewing court, must resolve conflicting evidence, and if the evidence can support either outcome, the reviewing court may not substitute

its judgment for the judgment of the ALJ.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005); see also Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992).  An ALJ's decision will not be reversed for harmless error.  Id.; see also Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1991).

### A.    Definition of Disability

In order to qualify for disability benefits, a plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Social Security Administration ("SSA") utilizes a five-step sequential evaluation process in making a determination of disability.  20 C.F.R. § 404.1520; see Reddick, 157 F.3d at 721.  If the SSA finds that the claimant is either disabled or not disabled at a step, then the SSA makes the determination and does not go on to the next step; if the determination cannot be made, then the SSA moves on to the next step.  See 20 C.F.R. § 404.1520.

### B.    Determination of Disability

First, the SSA looks to the claimant's work activity, if any.  If the claimant is engaging in substantial gainful activity, she is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(I).  Second, the SSA considers the severity of impairments; the claimant must show that he has a severe medically determinable physical or mental impairment (or combination of severe impairments) which has which has lasted or is expected to last twelve months or end in death.  See 20 C.F.R. § 404.1520(a)(4)(ii).  Third, the SSA considers whether a claimant's impairments meet or equal a listing in 20 C.F.R. Part 404 Appendix 1.  If so, the claimant is deemed disabled.  See 20 C.F.R. § 404.1520(a)(4)(iii).  Fourth, the SSA considers the claimant's residual functional capacity ("RFC") and past relevant work.  If the claimant can still engage in past relevant work, he is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv).  Fifth, the SSA considers whether, in light of the claimant's RFC and age, education, and work experience, the claimant is able to make an adjustment to another occupation in the national economy; if so, the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c).

The claimant bears the burden on steps one through four.  See Reddick, 157 F.3d at 721.  If a claimant establishes an inability to perform her prior work at step four, the burden shifts to the SSA to show that the claimant can perform other substantial work that exists in the national economy at step five.  Id.

## V.    DISCUSSION

### A.    Weighing of Medical Opinion Evidence

Plaintiff argues that the ALJ erred in numerous ways in weighing the medical opinion evidence concerning Plaintiff.  The Ninth Circuit employs a hierarchy with respect to the weight that the ALJ is to give medical opinions.  Specifically, it "distinguishes among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  Id.  "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence."  Ryan v. Comm'r of Soc. Sec. Admin, 528 F.3d 1194, 1198 (9th Cir. 2008).  "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."  Id.

#### i.    Dr. Phillips

The ALJ made the following findings regarding the medical opinions of Dr. Phillips, a psychological consulting examiner:

> The undersigned assigns significant weight to the January 31, 2017, opinion of psychological consultative examiner, Theresa Phillips, Psy.D., who noted that the claimant had moderate limitations in his ability to understand, remember, and carry out complex instructions and in his ability to make judgments on complex work related decision[s] (Exhibit 16F).  In addition, Dr. Phillips noted moderate to severe limitations in his ability to interact appropriately with the public, supervisors, and co-workers, as well as having moderate to severe limitations in his ability to respond appropriately to usual work situations and to changes in a routine work setting and in his ability to adapt to changes, hazards, and stressors (Exhibit 16F).

United States District Court
Northern District of California

Dr. Phillips' opinion is assigned significant weight in assigning the claimant's mental functioning limitations and moderate "paragraph B" findings as her opinion was based on objective medical findings and personal observations consistent with the evidence as a whole.

AR 26.

Dr. Phillips opined that Plaintiff is severely limited in his "ability to interact appropriately with co-workers, supervisors, and the public on a regular basis." AR 738. In another medical source statement, however, Dr. Phillips opined that Plaintiff is only moderately limited in these areas. AR 739.

Plaintiff argues that pursuant to SSR 85-15, Dr. Phillips' severe limitation opinion on Plaintiff's ability to interact appropriately in the workplace justifies a finding that he is disabled. Dr. Phillips also opined that Plaintiff is severely impaired in his ability to adapt to changes, hazards, or stressors in the workplace. As Plaintiff points out, SSR 85-15 states that:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work conditions; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15.

Plaintiff does not acknowledge that SSR 85-15 only provides guidance for situations "[w]here a person's only impairment is mental . . . ." Id. Here, the ALJ assigned exertional as well as nonexertional limits. Therefore, SSR 83-14 applies instead, which requires a two-step process. First, the ALJ must determine "whether a finding of disability may be possible based on the strength limitations alone." SSR 83-14. If a disability is not found based on the exertional impairments, then the ALJ must determine if "the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." Id. This includes consideration of "how the totality of limitations or restrictions reduces the occupational base of administratively

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

noticed unskilled sedentary, light, or medium jobs." Id. The regulations recognize that a vocational resource may be either helpful or necessary depending on the complexity of the case. Id.

Defendant opposes summary judgment on this issue and moves to remand for further administrative proceedings to enable the Commissioner to re-evaluate Plaintiff's claim. As Defendant points out in its remand motion, Dr. Phillips' typed medical source statement assigned severe impairments in Plaintiff's ability to: (1) interact appropriately with co-workers, supervisors, and the public on a regular basis; and (2) adapt to changes, hazards, or stressors in the workplace setting. AR 727. Yet she also attached handwritten notes from the same date that assign only moderate limitations to each of these factors. AR 729. Both documents from Dr. Phillips are signed and dated.

Here, the ALJ already obtained testimony from a vocational expert on the effect of limitations on Plaintiff's ability to interact appropriately with supervisors, co-workers, and the public on a regular basis. At the hearing, the ALJ posed hypotheticals to the vocational expert, including whether an individual who can never respond appropriately to supervisors, coworkers, or the public is capable of work. The vocational expert testified that there are no jobs in the economy that this hypothetical person could perform. AR 68. Ultimately, the ALJ incorporated Plaintiff's ability to frequently "respond[ ] appropriately to supervisors, coworkers, and the public" and limited Plaintiff's use of judgment to simple, work-related decisions to accommodate his difficulties in dealing with changes in a work setting. AR 22.

Plaintiff urges the Court to deny Defendant's motion to remand on the theory that if Dr. Phillips' opinions on his severe limitations are credited as true Plaintiff must be found to be disabled and the case should be remanded for benefits. However, the ALJ specifically adopted Dr. Phillips' moderate "paragraph B" criteria, which includes interacting with others and adapting to change in the workplace. These moderate limitations appear to be consistent with the ALJ's findings regarding limitations on responding to supervisors, co-workers, and the public and adapting to changes in the workplace.

Defendant asks the Court to remand Plaintiff's case for further administrative proceedings,

33

pursuant to 42 U.S.C. § 405(g)[1], to enable the Commissioner to re-evaluate this claim. Defendant notes that Plaintiff raises numerous issues in his Motion relating to the ALJ's evaluation of medical evidence and purported limitations based on his mental impairments. Defendant agrees with Plaintiff that the ALJ did not adequately address Dr. Phillips' opinion in the RFC. AR 722–30. Defendant urges that further administrative proceedings are necessary and useful because the ALJ will reevaluate the medical opinion of Dr. Phillips, which is a fact-intensive and individualized determination that is appropriately left to an ALJ to decide and may result in a different RFC. Defendant states that it does not agree with Plaintiff's various arguments that the ALJ erred in evaluating medical opinion evidence from other doctors and in assessing the RFC. Defendant argues that those issues are moot as remand is necessary to address the deficiency related to Dr. Phillips' opinions.

The ALJ does not specifically explain why he adopted Dr. Phillips' moderate limitations, as opposed to the severe limitations. The ALJ stated, without elaboration, that "her opinion was based on objective medical findings and personal observations consistent with the evidence as a whole." See SSR 96-8p, 1996 WL 374184, at *7 ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). These explanations are insufficient, particularly where the severe limitations are echoed at least in part in the assessments by Drs. Stauffer, Franklin, and Catlin. The Court is not in the position, as Plaintiff apparently urges, to simply accept Dr. Phillips' severe limitations. As Defendant notes, because of the ALJ's deficiency in addressing the opinion of Dr. Phillips, it is the ALJ's responsibility to explain his opinion in the first instance. For this reason, the Court grants Defendant's motion for remand so the ALJ may address the opinion of Dr. Phillips.

### ii.    Drs. Newton and Stauffer

Plaintiff argues that the ALJ in this case erred when he gave most weight to a non-examining medical consultant who never met the claimant, Dr. Newton, M.D. and little weight to

---

[1]Section 405(g) states: The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g).

United States District Court
Northern District of California

treating psychiatrist, Dr. Stauffer, M.D. who treated the claimant for almost three years at the time

of the hearing. Claimant has been treated at the Schuman-Liles by Dr. Stauffer, M.D. since

September 2014.  Plaintiff further argues that a treating physician's opinion should not be rejected,

even when it is not well supported or is inconsistent with other evidence.  "Treating source

medical opinions are still entitled to deference and must be weighed using all of the factors

provided in 20 CFR 404.1527 and 416.927." SSR 96-2p; see 20 C.F.R. § 416.927(d). These

factors include the nature, extent and length of the treatment relationship, frequency of

examination, supportability, consistency and specialization. 20 C.F.R. § 416.927(d).  Plaintiff

urges that, based on these factors, the ALJ should have given his treating physician's opinions

significant weight.

Plaintiff began seeing Dr. Stauffer for psychiatric care at the Schuman-Liles Clinic in

September 2014.  Plaintiff had over a dozen appointments with Dr. Stauffer.  In a mental

impairment questionnaire dated December 17, 2016, Dr. Stauffer opined that Plaintiff has

moderate to extreme functional limitations that impact his ability to work.  The ALJ gave little

weight to Dr. Stauffer's opinions because the questionnaire was a check-the-box form with little

explanation for Dr. Stauffer's assessment.  The ALJ also reasoned that Dr. Stauffer opined that

Plaintiff's symptoms have been present since 1996, although Dr. Stauffer only began treating him

in 2014 and before that time Plaintiff denied having psychiatric issues.  The ALJ further noted that

Plaintiff's treatment has been relatively conservative, and Dr. Stauffer inaccurately reported that

Plaintiff has never used alcohol or drugs, which suggests that he did not have a full view on

Plaintiff's condition.  By contrast, the ALJ assigned great weight to the opinions of non-examining

state agency consultant Dr. Newton, who provided an assessment of Plaintiff's physical

capabilities.

Plaintiff notes that Dr. Stauffer diagnosed him with Chronic Schizoaffective d/o, PTSD

and GAF 40 (AR 529) with the following symptoms: auditory hallucinations (AR 526), voices tell

him he's an "alien" (AR 527, 532), hasn't slept all night,… Seroquel (AR 527), afraid to go

outside (AT 526, 543; 662; 663), hypervigilant at night, pacing (AR 543, 547), panic symptoms,

"feel like I'm choking" (AR 547). "Somewhat disheveled and malodorous. Wearing bike helmet

(pt reports it is to keep him safe from attackers), sits on floor. Sunglasses throughout session"
(AR 1198). Plaintiff argues that the ALJ made three errors.

First, the ALJ stated that Dr. Stauffers' opinion consisted primarily of checked off boxes without any explanations which Plaintiff contends is not true. AR 25. Plaintiff argues that Dr. Stauffer summarized from detailed treatment notes and then answers in Question 6 the clinical findings that demonstrate the severity of Plaintiff's symptoms. AR 720. Plaintiff further argues that the ALJ failed to account for the years of treatment notes from Shuman-Liles and West Oakland Health Center supporting Dr. Stauffer's questionnaire. Plaintiff contends that the fact that check boxes are part of the form is not a legitimate reason for giving Dr. Stauffer's opinion little weight.

Second, the ALJ improperly called into question Dr. Stauffer's understanding because the doctor failed to note drug use. Plaintiff admits that it would have been better for Dr. Stauffer to have written about the drug use but notes that he did not have the East Bay Pain Clinic treatment notes from the 4-month period in 2016 where Plaintiff tested positive for cocaine. Plaintiff states that Dr. Stauffer was aware of the fact that Plaintiff was being treated by a pain specialist and thus regularly screened for illicit substances. However, to continue to be eligible for pain management services clean drug results are required. Thus, Plaintiff argues, as far as Dr. Stauffer was concerned Plaintiff's drug use was being monitored by the pain clinic. Therefore, Plaintiff contends that the ALJ's reason is not a legitimate basis to ignore ongoing observations from Dr. Stauffer's care or opinion that Plaintiff suffers from serious mental illness not caused by drugs.

Third, Plaintiff contends that the ALJ erred by noting that Plaintiff's treatment has been essentially routine and conservative in nature citing a lack of cortisone injections and surgery due to fear. Plaintiff argues that a claimant may not be faulted for failing to seek treatment, particularly where the claimant suffers from mental illness, or if the record shows [he] cannot afford regular treatment. Regennitter v. Commissioner of the Social Security Administration, 166 F.3d 1294, 1299-1300 (9th Cir. 1999) ("It is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." (quoting Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989))). Plaintiff argues that the ALJ's reasons for

discounting Dr. Stauffer's opinions are not specific, legitimate, or based on substantial evidence. Defendant does not address this point directly but simply argues for a remand so the ALJ can evaluate Dr. Phillip's medical opinion. The Court agrees. As the case is being remanded for further proceedings, the ALJ should also reconsider the weight accorded to these medical opinions.

### iii.    Drs. Catlin and Franklin

Plaintiff argues that the ALJ erred in giving little weight to two examining psychologists, Dr. Catlin, PsyD and Dr. Franklin, PhD. As noted above, the ALJ is required to weigh evidence according to several factors, including: length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability; consistency; and specialization. 20 CFR § 416.927. Plaintiff argues that where the opinion of an examining physician is contradicted by the opinion of another doctor, the examining physician's opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Andrews v. Shalala, 53 F.3rd 1035, 1043 (9th Cir. 1995). Plaintiff contends that the ALJ erred by failing to consider all relevant factors when assigning weight to the examining sources and failing to provide "specific and legitimate" reasons for rejecting them.

As for the little weight given to Dr. Catlin, the ALJ indicated that his reasoning for doing so was because her opinion is "inconsistent with treatment notes showing the claimant to have intact memory." AR 487, 491, 496, 532. Plaintiff notes that while Exhibit 6F5 states "memory intact" on the same page it also notes "the patient does not demonstrate the appropriate mood or affect." AR 487. Plaintiff argues that the ALJ cannot undermine Dr. Catlin's report without looking at the entire picture. Exhibit 6F9 notes intact memory again, but the emphasis of this appointment date was on his physical state (DX: Hypertension and Backache). AR 491. Exhibit 6F12 was an appointment primarily for physical care (DX: Degenerative Joint Disease, EKG Abnormality) **so** the note is merely limited and not necessarily contradictory with the rest of the record. AR 494.

Plaintiff also criticizes the ALJ's observation that Plaintiff's record shows no evidence of decompensation in the form of involuntary hospitalization. Plaintiff argues that, not only is this

37

not a requirement, Plaintiff has decompensated in the community and in jail. In the community, he feels like something really bad is going to happen to him and stays up all night being hypervigilant, is afraid to go outside and is disheveled and malodorous. AR 547, 663, 669. In jail, he was placed in administrative segregation because of difficulty with staff and other prisoners. AR 474. Plaintiff further states that he has a long psychiatric history of GAF scores in the 40s. AR 529. While the ALJ's noted that GAF scores are not meant to reflect the claimant's longitudinal functioning, Plaintiff argues that his GAF scores do not stand alone and are derived from over two years of treatment records with Shuman-Liles.

Plaintiff further argues that Dr. Catlin's conclusions are well supported because she performed a thorough evaluation of Plaintiff in September 2014. She conducted a clinical interview, reviewed the record, and administered four psychological tests. Plaintiff argues that, although it was a one-time evaluation, it was more thorough than what Dr. Newton, M.D., Dr. Daniels, M.D. and Bilik, Psy.D., conducted. They never evaluated, observed, or treated the claimant, yet the ALJ gave them great weight.

Plaintiff also criticizes the ALJ for assigning little weight to examining psychologist Dr. Franklin. Plaintiff argues that the ALJ gave little weight to Dr. Franklin's evaluation because of the lack of evidence of involuntary psychiatric hospitalization. As Plaintiff asserts, involuntary hospitalization is not a requirement for disability determination and the court erred by requiring Dr. Franklin's opinion to be consistent with such evidence. Plaintiff contends that the ALJ's reasons for doing so are unsubstantiated. Plaintiff argues that involuntary psychiatric hospitalizations are not a requirement of disability determinations and is not the sole source of evidence for disability. Rather, according to Plaintiff, involuntary psychiatric hospitalizations/highly structured settings is merely one element in the "C criteria" requirement of a highly structured setting. Plaintiff contends that the ALJ ignored alternative B criteria here as a potential indicator of listing level disability. Plaintiff further argues that the ALJ mischaracterized Plaintiff' psychiatric appointments and medicines as "conservative mental health treatment." That he takes Zyprexa with no control over his voices, Paroxetine, and Seroquel is not conservative. Plaintiff further contends that Dr. Franklin's conclusions are well supported. She performed a

thorough evaluation of Plaintiff in October 2016.  It was based on a clinical interview, four procedures to determine cognitive functioning and mental health, and a review of his medical records.

Plaintiff argues that the ALJ erred in assigning little weight to the opinions of Dr. Franklin when greater weight should have been afforded to as examining psychologists who conducted objective testing and whose opinions are well supported.  Defendant does not address this point directly.  As this case is remanded for further proceedings, the ALJ should also re-evaluate the weighing of these medical opinions.

### B. Determination of Whether Plaintiff's Impairments Meet or Equal a Listing

Plaintiff argues that the ALJ erred in finding Plaintiff does not meet or equal listings 12.03, 12.05, 12.04, 12.06, and 12.08 by substituting the lay opinion of moderate limitations in B criteria. AR 19.  The ALJ stated "because the claimant's mental impairments do not cause at least two marked limitations or one extreme limitation, the paragraph B criteria are not satisfied."  AR 20. For understanding/remembering/or applying information, the ALJ gave him a moderate limitation because he is able to use public transportation and "care for two pet dogs."  Id.  Plaintiff argues that the Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.  One does not need to be 'utterly incapacitated' in order to be disabled."  Vertigan v Halter, 260 F.3d 1044, 1050 (9th Cir. 2001)(quoting Fair v Bowen, 885 F.2d 597, 603 (9th Cir. 1989)); Cooper v Bowen, 815 F.2d 557, 561 (9th Cir. 1987); Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) ("disability plaintiffs should not be penalized for attempting to lead normal lives in the face of their limitations"). Plaintiff argues that the ALJ improperly substituted his lay opinion for the opinions of Dr. Catlin who assessed a severe impairment in memory and Dr. Franklin and Dr. Stauffer who assessed a Marked and Extreme impairment in Remembering Detailed instructions, respectively.

For interacting with others, the ALJ gave Plaintiff a moderate limitation because he has one long lasting friendship, but this is mostly a caretaking relationship as this friend gives Plaintiff

rides to appointments, and cooks for him.   Plaintiff states that the ALJ improperly emphasized the ability to go to church in a safe environment and extrapolated an ability to work with others. Further, Plaintiff argues that the ALJ must cite specific and legitimate reason to disagree with the doctors' assessments of marked and extreme limitations in social functioning, but the ALJ failed to do so here.

Plaintiff takes issue with the ALJ's assessment of moderate impairments for concentration/persisting/maintain pace and adapting oneself.  Plaintiff argues the fact that he can be "oriented for medical appointments," live with his friend Venus, or use public transportation does not show a lack of disability.  Plaintiff contends that the ALJ improperly faulted Plaintiff for 1) "conservative" treatment/not attending his medical appointments or 2) the ALJ's attributions of weaker impairments due to his "ability to attend his regular pain management and psychiatric appointments."

Finally, Plaintiff states that none of the activities listed by the ALJ require being punctual, maintaining attendance, or interacting with the public, which are skills necessary for employment. That Plaintiff can meet some basic needs is not a clear and convincing reason to find him not credible. In sum, he argues that he has met the B criteria of listings 12.03, 12.04, 12.05, and 12.06.

As to Listing 12.05 "Intellectual Disability," Plaintiff contends that the ALJ improperly discounted Dr. Franklin's IQ score of 55 and note of special education history.  The ALJ noted "the administration of WASI does not amount to the administration of a standardized intelligence test because this test does not have a mean of 100 and thus these results cannot be used to meet or equal a listing."  AR 22.  However, Plaintiff argues, testing with a mean of 100 is only one way to meet the Intellectual Disability listing (See "comparable" language below).

Plaintiff further states that, most importantly, there was a full WAIS test with a mean of 100 conducted with a score of 73 from Consultative Examiner, Dr. Phillips, PsyD on January 31, 2017. AR 726.  Plaintiff contends that the ALJ attempted to discount this 73 score because it was not accompanied by Marked or Extreme B criteria.  Plaintiff argues that the record is replete with marked B criteria from Dr. Franklin, Catlin, and treating provider, Dr. Stauffer, M.D.  AR 472, 481, 700, 701, 706, 714-719.  Plaintiff notes that "[o]nly qualified specialists, Federal and State

agency medical and psychological consultants, and other contracted medical and psychological experts may conclude that your obtained IQ score(s) is not an accurate reflection of your general intellectual functioning." (12.00H). Therefore, Plaintiff argues that the ALJ erred in concluding that the IQ scores were not an accurate reflection of his intellectual functioning. Plaintiff suggests that the ALJ's questions regarding accuracy should have been directed to either the evaluating or treating doctors, or even a medical expert, but were not. Plaintiff contends that the ALJ erred by not accepting Dr. Phillips' FSIQ, according to 12.00(H). No other qualified specialist, medical or psychological consultant, disagreed with Dr. Phillips, thus, the ALJ substituted his lay opinion for that of the doctor, which he is not permitted to do.

For listings 12.03, 12.05, 12.04, 12.06, and 12.08, Defendant argues that the Court grant the motion for remand because the ALJ will reevaluate the opinion of Dr. Phillips, which must be considered with the other evidence and may result in different findings for the B criteria.

For listing 12.05, Defendant asserts that Plaintiff's motion ignores that there is a separate requirement that "evidence about [the claimant's] intellectual and adaptive functioning and about the history of [the] disorder demonstrates or supports the conclusion that the disorder began prior to [the] attainment of age 22" (AR 21). 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05B.3. Defendant notes that, in his motion, Plaintiff did not challenge the ALJ's finding that "objective evidence of an intellectual disorder prior to attaining age 22 is not present in the record" nor did he challenge any of the underlying evidence the ALJ cited in support of that finding (AR 22, citing AR 242, 313–14, 340, 700, 715). Defendant states that, the ALJ explicitly stated that the lack of evidence of the disorder before age 22 was the "first and foremost" reason that Listing 12.05 was not met (AR 22). Defendant persuasively argues that the Plaintiff failed to substantively challenge this finding, and therefore failed to establish that he meets Listing 12.05 and benefits should not be awarded on this ground.

Plaintiff has not met his burden that he is entitled to summary judgment on this claim. These issues may be addressed on remand.

### C. Whether RFC Was Supported by Substantial Evidence

Plaintiff argues that the ALJ erred by finding that Plaintiff's physical RFC is medium, not

light. Plaintiff contends that light is at most what his physical RFC should be assessed. Plaintiff notes that he has a 2015 Lumbar Spine MRI noting "moderate right L4-5 foraminal stenosis." AR 620. Furthermore, in his September 2013 X-rays in his knee show "moderate bilateral arthrosis." AR 634. He cannot ambulate effectively as he walks with a limp and a cane. AR 701. He has shoulder pain from metallic fragments seen projecting over his left chest. AR 504. Plaintiff argues that the ALJ erred by assigning Medium RFC that is based on a prior report of claimant running several miles a day because that prior report was in July 2013, prior to later Xrays and MRIs. AR 376, 20. Since then, Plaintiff contends that his condition has worsened.

Plaintiff further argues that he cannot meet the non-exertional requirements of work. He contends that the ALJ should have found Plaintiff unable to perform any job in the national economy. He notes that All work requires the ability to meet certain non-exertional demands. He cites SSR 85-15:

> [t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, remember and carry out simple instructions; to respond appropriately to supervision, coworkers and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the occupational base. This in turn, would justify a finding of disability because even favorable age, education or work experience will not offset such a severely limited occupational base.

SSR 85-15.

Plaintiff claims that the ALJ improperly evaluated the medical evidence from Consultative Examiner Dr. Phillips, who noted "extreme" limitations in responding to supervision, coworkers and usual work situations. AR 727. Plaintiff states that even if it were true that he has moderate limitations in all areas, the VE, Stephen B. Schmidt, whom the judge did find credible, testified that there would be no jobs in the national economy if there were limitations in 1) missing work just one or two days a month or 2) if there was a moderate difficulty in maintaining concentration, persistence, and pace. Plaintiff notes that Dr. Stauffer's report found that he would miss 5 or more days a month and be markedly off task at more than 30% of the time. AR 719.

Defendant states that Plaintiff's contention that his RFC is "at most" light, not medium, is

1    a matter that would be appropriately resolved by further proceedings, as it requires the weighing of

2    evidence and the RFC will already be reassessed as part of the re-evaluation of Dr. Phillips's

3    opinion.

4        Plaintiff has not met his burden that he is entitled to summary judgment on this claim.  On

5    remand, this issue should be re-evaluated.

6        **D.      Whether to Remand for Further Proceedings or Benefits**

7        Plaintiff's requested relief is to grant his motion for summary judgment, to reverse the

8    decision of the Commissioner, and to remand this case with instructions to award benefits.

9    Alternatively, Plaintiff requests that the Court remand the case for further proceedings.  Defendant

10   opposes all of Plaintiff's requested relief except the request to remand for further proceedings.

11       Plaintiff argues that the Court should credit evidence that was rejected and remand for an

12   award of benefits "if 1) the ALJ failed to provide legally sufficient reasons for rejecting the

13   evidence; 2) there are no outstanding issues that must be resolved before a determination of

14   disability can be made; and 3) it is clear from the record that the ALJ would be required to find the

15   claimant disabled were such evidence credited." Benecke, 379 F.3d at 593 (citing Harman, 211

16   F.3d at 1178). Where the Harman test is met, the Court will credit the evidence as true and remand

17   for an award of benefits.  Benecke, 379 F.3d at 593 (citation omitted).

18       Plaintiff further states that the ALJ failed to provide legally sufficient reasons for rejecting

19   the medical evidence and for finding claimant not credible.  Plaintiff contends that there are no

20   outstanding issues that must be resolved to make a disability determination.  Plaintiff urges that

21   the evidence establishes that, had the ALJ properly credited the treating and evaluating evidence,

22   the ALJ would be required to find Plaintiff disabled pursuant to Step Three of the Sequential

23   Evaluation Process based upon the Listings, or alternatively, pursuant to Step Five because he is

24   unable to respond appropriately to supervision, coworkers and work situations, and is unable to

25   deal with changes in a routine work setting, with a resulting inability to meet the mental demands

26   of competitive, remunerative work on a sustained and consistent basis.

27       Plaintiff further contends that additional development of the record is not necessary here as

28   there are no outstanding issues that must be resolved and the record clearly shows disability.

Plaintiff argues that a remand for further proceedings would serve no useful purpose and an immediate award of benefits is warranted. Plaintiff requests, however, that if this case is remanded for further proceedings, the case be remanded to a different judge.

Defendant urges the Court to reject Plaintiff's argument that he is entitled to benefits pursuant to step five (Mot. at 17). As discussed above, the ALJ's RFC did not account for certain limitations from Dr. Phillips. Remand is appropriate so the ALJ can serve as fact-finder, reassess Dr. Phillips's opinion, resolve any conflicts in the evidence, and sufficiently explain the rationale for any rejected opinions. Once this purpose is fulfilled, which may result in a different RFC, a step five finding can be made.

Defendant notes that it already agreed to a remand for further proceedings, but further states that the decision of ALJ assignment is within the Appeals Council's discretion. Defendant argues that Plaintiff provided no explanation as to why his case should be assigned to a new ALJ, or why the Appeals Council should deviate from its typical practice in which "hearing office management will usually assign a remand order to the same ALJ for processing." HALLEX I-3-7-40, available at 1993 WL 643170.

Defendant disputes Plaintiff's argument that his case "was so strong" that counsel filed an "On the Record/OTR" hearing request (Mot. at 16–17, citing HALLEX I-2-1-40, available at 2004 WL 3389613). Defendant argues that this is not a ground for awarding benefits and Plaintiff provides no competent argument in support thereof. And while the Commissioner does not agree that any error occurred because Plaintiff did not receive an expedited writing under HALLEX I-2-1-40, HALLEX "does not impose judicially enforceable duties on either this court or the ALJ." Lockwood v. Comm'r of Soc. Sec., 616 F.3d 1068, 1073 (9th Cir. 2010).

Defendant further notes a court may credit certain evidence as "true" and award benefits only under very limited circumstances. Leon v. Berryhill, 880 F.3d 1041, 1044 (9th Cir. 2017), as amended (Jan. 25, 2018) ("An automatic award of benefits in a disability benefits case is a *rare and prophylactic exception* to the well-established ordinary remand rule.") (emphasis added); Treichler, 775 F.3d at 1099 (remand for further proceedings is "the proper course, except in rare circumstances" in Social Security cases).

1    Specifically, Defendant argues that a court may credit certain evidence as "true" and award

2    benefits if: (1) an ALJ failed to provide legally sufficient reasons for rejecting evidence; (2) there

3    are no outstanding issues on which further proceedings in the administrative court would be

4    useful; and (3) it is clear from the record that the ALJ would be required to find the claimant

5    disabled were such evidence credited.  Burrell v. Colvin, 775 F.3d 1133, 1141 (9th Cir. 2014);

6    Leon, 880 F.3d at 1044–45; Treichler, 775 F.3d at 1103–04.  A claimant, however, "is not entitled

7    to benefits under the statute unless [he] is, in fact, disabled, no matter how egregious the ALJ's

8    errors may be."  Strauss v. Comm'r, 635 F.3d 1135, 1138 (9th Cir. 2011) (emphasis added);

9    Brown-Hunter v. Colvin, 806 F.3d 487, 495 (9th Cir. 2015) ("The touchstone for an award of

10   benefits is the existence of a disability, not the agency's legal error.") (emphasis added).  Courts

11   must remand for further proceedings if "an evaluation of the record as a whole creates serious

12   doubt that a claimant is, in fact, disabled."  Garrison v. Colvin, 759 F.3d 995, 1021 (9th Cir. 2014);

13   Burrell, 775 F.3d at 1141 (there is no need to evaluate whether "the three preliminary

14   requirements" of the rule are met if the record contains "serious doubt" that the claimant is

15   disabled).

16   Defendant argues that further administrative proceedings are necessary and useful because

17   the ALJ will reevaluate the medical opinion of Dr. Phillips, which is a fact-intensive and

18   individualized determination that is appropriately left to an ALJ to decide and may result in a

19   different RFC.  Defendant further argues that there are "numerous inconsistencies and factual

20   issues" that raise serious doubt about whether Plaintiff is disabled.  For example, Defendant points

21   to: Plaintiff alleged that he stayed indoors, had difficulty walking, could not sit or stand too long,

22   and relied on his friend for meals and reminders to care for himself.  AR 46–47, 56–57, 62, 253–

23   55, 258; see AR 23.  He alleged he tries to do housework but is afraid to leave the house by

24   himself because of paranoia and voices, and he did not socialize.  AR 50, 256–57.  But, as the ALJ

25   noted, Plaintiff's treatment records indicated that he played basketball and used drugs at parties.

26   AR 25, citing AR 616, 652.  In addition, Dr. Phillips stated Plaintiff was independent with his

27   daily activities.  AR 723.  He could prepare meals, was able to drive, took public transportation

28   without supervision, could make change and shop in stores, and cared for his personal needs (AR

45

723; *see* AR 25 [citing Dr. Phillips's report]; <u>compare with</u> AR 715 [Dr. Stauffer indicated Plaintiff had a "[c]omplete inability to function independently outside" of his home]).  He spent his days doing light household chores, watching television, and visiting with family and friends. AR 723.  Additional medical records noted Plaintiff walked regularly and would at one time run "daily for miles" (AR 392, 394, 421) and his friend indicated that he was "pretty good at traveling alone" and liked to walk to the lake and feed birds.  AR 266.  Plaintiff also told Dr. Phillips that his response to psychotropic medications was "good" with "no reported side effects" and that he was compliant with medication.  AR 723.  Defendant contends that these activities show that Plaintiff was capable of much more than he alleges, raise serious doubt as to whether he has a totally disabling impairment, and illustrate why further proceedings would be useful.

Plaintiff has not shown that he is entitled to summary judgment or that further administrative proceedings would be unnecessary or futile.  The Court grants Defendant's request and remands this matter for further proceedings.

**VI.    CONCLUSION**

For the reasons discussed above, the Court DENIES Plaintiff's motion and GRANTS Defendant's motion.

**IT IS SO ORDERED.**

Dated:  09/12/2019

ELIZABETH D. LAPORTE
United States Magistrate Judge